**Case No. 16-5355**

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA

OWNER-OPERATOR INDEPENDENT DRIVERS
ASSOCIATION, INC., et al.,

Appellants,

vs.

UNITED STATES DEPARTMENT OF
TRANSPORTATION; et al,

Appellees.

On Appeal from a Final Order of the
U.S. District Court for the District of Columbia
(Chief Judge Beryl A. Howell)

Civil Action No. 12-1158 (BAH)

# APPELLANTS' BRIEF

PAUL D. CULLEN, SR.
JOYCE E. MAYERS
PAUL D. CULLEN, JR.
The Cullen Law Firm, PLLC
1101 30th Street NW, Suite 300
Washington, DC 20007
Tel: (202) 944-8600
Fax: (202) 944-8611

*April 7, 2017*                                  *Counsel for Petitioners*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Petitioner Owner Operator Independent Drivers Association, Inc. states that it has no parent companies, subsidiaries (including wholly-owned subsidiaries), or affiliates that have issued shares to the public.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT……………………………………..i

TABLE OF CONTENTS……………………………………………………..ii

TABLE OF AUTHORITIES……………………………………………………iv

GLOSSARY OF ABBREVIATIONS………………………………..…………x

STATEMENT OF JURISDICTION………………………………………………1

STATEMENT OF ISSUES PRESENTED……………………………………...2

STATEMENT OF THE CASE……………………………………………………3

    A. Nature of the Case………………………………………………………...3

    B. Statutory and Regulatory Background……………………………………8

        1. Regulation of Commercial Motor Vehicle Safety……………………8

        2. DataQs…………………………………………………………10

        3. DataQs User Guide and Manual…………………………………11

        4. DataQs Interpretive Rule .................................................................12

    C. Statement of Facts………………………………………………………13

    D. Procedural History………………………………………………………16

    E. Ruling Presented for Review……………………………………………18

SUMMARY OF ARGUMENT……………………………………………...19

ARGUMENT………………………………………………………………...22

    I.    STANDARD OF REVIEW .......................................................................22

II.     THE DISTRICT COURT ERRED IN FINDING THAT THE SUPREME
        COURT IN *SPOKEO* AND THIS CIRCUIT IN *HANCOCK* REDEFINED
        THE REQUIREMENTS FOR INJURY-IN-FACT .....................................22

III.    COURTS APPLYING *SPOKEO* HAVE REAFFIRMED
        CONGRESSIONAL POWER TO IDENTIFY STATUTORILY DEFINED
        INTERESTS THE VIOLATION OF WHICH ALONE ARE SUFFICIENT
        TO SUPPORT INJURY-IN-FACT ...........................................................27

IV.     THE STATUTORY VIOLATIONS PLAINTIFFS ALLEGE ARE
        SUFFICIENTLY CONCRETE TO SUPPORT STANDING .....................32

V.      PLAINTIFFS HAVE NOT ALLEGED A BARE PROCEDURAL
        VIOLATION SEPARATE FROM THE STATUTORILY EXPRESSED
        INTERESTS IN ENSURING ACCURACY IN MCMIS RECORDS.........38

VI.     PLAINTIFFS' CHALLENGE TO FMCSA'S CONTINUED POLICY OF
        INACTION IN ENSURING THE ACCURACY OF DRIVER RECORDS
        IN MCMIS IS NOT MOOT.....................................................................43

CONCLUSION .................................................................................................54

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

## *Cases*

*Arizonans for Official English v. Arizona*,
  520 U.S. 43 (1997)..............................................................................47

*Campbell-Ewald Co. v. Gomez*,
  136 S. Ct. 663 (2016).........................................................................46

*Chafin v. Chafin*,
  133 S. Ct. 1017 (2013).......................................................................47

*Church v. Accretive Health, Inc.*,
  654 F. App'x 990 (11th Cir. 2016)...............................................27, 32

*City of Houston, Tex. v. Dep't of Housing & Urban Dev.*,
  24 F.3d 1421 (D.C. Cir.1994) ......................................................47, 48

*Clapper v. Amnesty Int'l USA*,
  133 S. Ct. 1138 (2013).......................................................................25

*Clark v. Trans Union*,
  2016 WL 7197391 (E.D. Va. Dec. 9, 2016) .....................................27

*Del Monte Fresh Produce Co. v. United States*,
  570 F.3d 316 (D.C. Cir. 2009) ..........................................................47

*Dun & Bradstreet v. Greenmoss Builders*,
  472 U.S. 749 (1985)...........................................................................36

*Dunn v. Blumstein*,
  405 U.S. 330 (1972)...........................................................................49

*FEC v. Akins*,
  524 U.S. 11 (1998).............................................................................25

*Friends of Animals v. Jewell*,
  828 F.3d 989 (D.C. Cir. 2016) .....................................................27, 28

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974) ........................................................................36

*Hancock v. Urban Outfitters, Inc.*,
  830 F.3d 511 (D.C. Cir. 2016) ...........................................18, 23, 40

*Hardaway v. D.C. Housing Auth.*,
  843 F.3d 973 (D.C. Cir. 2016) ...................................................47, 49

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982).......................................................................26

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
  806 F.3d 125 (3rd Cir. 2015) ..........................................................29

*In re Horizon Healthcare Servs., Inc. Data Breach Litig.*,
  846 F.3d 625 (3rd Cir. 2017) ............................................27, 28, 35

*In re Navy Chaplaincy v. U.S. Navy*,
  697 F.3d 1171 (D.C. Cir. 2012) ......................................................48

*In re Nickelodeon Consumer Privacy Litig.*,
  827 F.3d 262 (3d Cir. 2016)............................................................29

*Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*,
  338 F.3d 1024 (D.C. Cir. 2003) ......................................................22

*Knox v. Service Emps.*,
  132 S. Ct. 2277 (2012)....................................................................47

*Lee v. Verizon Commu'ns Inc.*,
  837 F.3d 523 (5th Cir. 2016)...........................................................27

*Lujan v. Defenders. of Wildlife*,
  504 U.S. 555 (1992)................................................................*passim*

*Murphy v. Hunt*,
  455 U.S. 478 (1982)........................................................................49

v

*Nicklaw v. Citimortgage, Inc.*,
    839 F.3d 998 (11th Cir. 2016)...................................................................38, 41

*Owner-Operator Indep. Drivers Ass*'n *v. U.S. Dept. of Transp.*,
    2016 WL 5674626 (D.D.C. Sept. 30, 2016)...............................................18, 22

*Powell v. McCormack*,
    395 U.S. 486 (1980)...........................................................................................49

*Pub. Citizen v. Dep't of Justice*,
    491 U.S. 440 (1989)......................................................................................25, 26

*Qassim v. Bush*,
    466 F.3d 1073 (D.C. Cir. 2006) .......................................................................48

*Scenic America, Inc., v. U.S. Dept. of Trans.*,
    836 F.3d 42 (D.C. Cir. 2016) ...........................................................................22

*Silverado Stages, Inc. v. FMCSA*,
    809 F.3d 1268 (D.C. Cir. 2016) .......................................................................44

*Spokeo, Inc. v. Robins*,
    136 S.Ct. 1540 (2016).................................................................................*passim*

*Strubel v. Comenity Bank*,
    842 F.3d 181 (2d Cir. 2016)...................................................................27, 30, 31

*Genesis Healthcare Corp. v. Symczyk*,
    133 S.Ct. 1523 (2013).......................................................................................47

*Tenn. Valley Elec. Power Co. v. TVA*,
    306 U.S. 118 (1939)...........................................................................................26

*Thomas v. FTS USA*,
    193 F. Supp. 3d 623 (E.D. Va. 2016)........................................................*passim*

*Thorpe v. District of Columbia*,
    916 F. Supp. 2d 65 (D.D.C. 2013) ...................................................................49

vi

*U.S. Parole Comm'n v. Geraghty*,
    445 U.S. 388 (1980)..................................................................49, 50

*Van Patten v. Vertical Fitness Grp.*,
    847 F.3d 1037 (9th Cir. 2017)..................................................27, 32

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*,
    529 U.S. 765 (2000)..........................................................24, 27, 34

*Warth v. Seldin*,
    422 U.S. 490 (1975)..................................................................23, 31

*Weaver v. FMCSA*,
    744 F.3d 142 (D.C. Cir. 2014) ...............................................*passim*

## **<u>Statutes</u>**

15 U.S.C. § 1681...............................................................................*passim*

15 U.S.C. § 1681c(f) ......................................................................9, 43

15 U.S.C. § 1681e(b) ......................................................................9, 43

15 U.S.C. § 1681i(a) .......................................................................9, 43

28 U.S.C. § 1291............................................................................... 1

28 U.S.C. § 1331............................................................................... 1

28 U.S.C. § 1346............................................................................... 1

28 U.S.C. § 2342(3) ...........................................................................16

49 U.S.C § 31106(a)(3)...............................................................*passim*

49 U.S.C § 31106(a)(4)...............................................................*passim*

49 U.S.C § 31106(e)(1)..................................................................... 8

49 U.S.C. § 31150.........................................................................*passim*

49 U.S.C § 31150(a) ...................................................................*passim*

49 U.S.C § 31150(b) ...................................................................10, 33

49 U.S.C. § 31150(b)(1)..............................................................*passim*

49 U.S.C. § 31150(b)(4)..............................................................*passim*

49 U.S.C. § 31150(c) ...............................................................38, 42, 44

49 U.S.C. § 31150(d) ....................................................................... 5

49 U.S.C. § 31102............................................................................ 8

49 U.S.C. § 31102(c)(P)...........................................................8, 10, 43

5 U.S.C. § 552..........................................................................20, 34

5 U.S.C. § 552a..........................................................................*passim*

5 U.S.C. § 552a(g)(1)(C) .................................................................. 9

5 U.S.C. § 552a(e)(5) .....................................................................10

5 U.S.C. § 552a(e)(6) .....................................................................10

5 U.S.C. § 702 ............................................................................... 1

5 U.S.C. § 704 ............................................................................... 1

5 U.S.C. § 706 ............................................................................... 1

## <u>Regulations</u>

49 C.F.R., Parts 350-399............................................................... 8

*Motor Carrier Management Information System (MCMIS) Changes to Improve
   Uniformity in the Treatment of Inspection Violation Data,*
   79 Fed. Reg. 32491 (June 5, 2014).......................................12, 46, 51

*System of Records, Notice (MCMIS),*
  74 Fed. Reg. 66391-04 (December 15, 2009)................................................11, 45

## Public Laws

*Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for
  Users of "Safetea-Lu"* Pub. L. 109-59 (August 10, 2005) ................................... 1

## Other Authorities

Restatement (First) of Torts § 559 ....................................................................36

Restatement (First) of Torts § 568..............................................................36, 37

Restatement (First) of Torts § 569..........................................................35, 36, 41

Restatement (First) of Torts § 570..........................................................35, 36, 41

*Who should Define Injuries for Article III Standing,*
  68 Stan. L. Rev. Online 76 (Townsend 2015) ...............................................31, 37

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedures Act |
| AR | Administrative Record |
| CMV | Commercial Motor Vehicle |
| DATAQs | Procedure used by drivers to correct data in MCMIS database |
| DOT | Department of Transportation |
| FCRA | Fair Credit Reporting Act |
| FMCSA | Federal Motor Carrier Safety Administration |
| FMCSR | Federal Motor Carrier Safety Regulation |
| JA | Joint Appendix |
| MCMIS | Motor Carrier Management Information Systems |
| MCSAP | Motor Carrier Safety Assistance Program |
| OOIDA | Owner-Operator Independent Drivers Association, Inc. |
| PIA | Privacy Impact Assessment |
| PSP | Pre-employment Screening Program |
| RDR | Request for Data Review |
| SORN | System of Records Notice |

## <u>STATEMENT OF JURISDICTION</u>

This matter is properly before this Court pursuant to 28 U.S.C. § 1291 as an appeal from a final order of the District Court for the District of Columbia entered on September 30, 2016. (CA Nos. 12-1158 and 14-0548 (consolidated) (ECF ## 77 and 78).

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (Federal question jurisdiction) and 28 U.S.C. § 1346, (jurisdiction where the United States is a defendant).   This action arises under the Safe, Accountable, Flexible, Efficient Transportation Equity Act, Pub. L. 109-59; Title IV, § 4117(a); codified at 49 U.S.C. § 31150; and the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq*. *See also Weaver v. FMCSA*, 744 F.3d 142 (D.C. Cir. 2014).   An actual justiciable controversy exists between Plaintiffs/Appellants and Defendants/Appellees.  The requested relief is proper under 5 U.S.C. § 706.  The challenged agency actions and failure to act are subject to review under 5 U.S.C. §§ 702, 704 and 706.

This appeal was timely filed.  The District Court entered the final order disposing of all claims on September 30, 2016. (ECF # 77).  The Notice of Appeal was filed on November 22, 2016 (ECF # 79), within 60 days of the final order, pursuant to Rule 4(a)(1)(B), Federal Rules of Appellate Procedure.

## STATEMENT OF ISSUES PRESENTED

1.     Federal statutes governing the maintenance and dissemination of driver safety records expressly protect commercial motor vehicle drivers from the damaging consequences of inaccurate safety records by mandating that federal authorities implement procedures to ensure the accuracy of data recorded and to provide for a national motor carrier safety data correction system. 49 U.S.C. § 31106(a)(3) & (4); 49 U.S.C. § 31150(b)(1) & (4).  The administrative record demonstrates that Plaintiffs were issued citations for safety violations, which were either dismissed or the plaintiff adjudicated not guilty by state authorities.  The record demonstrates that Plaintiffs pursued all available procedures to correct their safety records maintained in databases for which Defendants bear statutory responsibility to assure accuracy, that Defendants refused to correct their records, and that the inaccurate safety records remain in Defendants' databases for a variety of uses and for dissemination to potential employers.  The record establishes that it is the continuing policy of Defendants to do nothing to investigate or evaluate the accuracy of data reported into Defendants' records systems by state authorities. Did the District Court err in finding that Plaintiffs established only a bare procedural violation of their statutory rights to the accuracy of their personal safety records insufficient to support Article III standing?

2.     Plaintiffs' inaccurate safety violations as originally alleged in the Amended Complaint are beyond the three year reportable date for dissemination through the pre-employment screening program.  However, Plaintiffs seek declaratory relief for their challenge to Defendants' continuing policy of inaction with respect to ensuring the accuracy of the safety records for commercial vehicle driver records maintained in its databases for which Defendants bear statutory responsibility.  Defendants' continuing policy exposes Plaintiffs, members of OOIDA and all commercial vehicle operators to the risk of the dissemination of inaccurate safety violation reports.  Is Plaintiffs' challenge to Defendants' ongoing policy presented in a concrete factual setting traditionally found sufficient to be capable of judicial resolution, and therefore justiciable in this action?

## STATEMENT OF THE CASE

### A.    Nature of the Case

Plaintiffs/Appellants brought this action seeking declaratory and injunctive relief under the Administrative Procedures Act and the Fair Credit Reporting Act ("FCRA") for the violation of the personal rights of the individual Plaintiffs, and the rights of thousands of members of the Owner-Operator Independent Drivers Association ("OOIDA"), created by federal statutes obligating Defendants/Appellees to assure the accuracy of information maintained in their records systems.  The U.S. Department of Transportation ("DOT"), through the

Federal Motor Carrier Safety Administration ("FMCSA"), operates and maintains the Motor Carrier Management Information System ("MCMIS") which contains information relating to the safety records of commercial truck drivers and motor carriers, including Plaintiffs here.  Federal statutes expressly place responsibility for ensuring the accuracy of the records contained in MCMIS, including Plaintiffs' safety violation records, squarely on Defendants.

In this case, the record establishes that FMCSA refuses to perform its statutory responsibilities to assure the accuracy of information in MCMIS, totally abdicating its obligation to the discretion of the States.  Defendants' refusal, as established by the record, has had and continues to threaten, the particularized and concrete interests of Plaintiff drivers and members of OOIDA:

- Defendants have failed to establish policies and procedures to assure that release of information under the pre-employment screening program ("PSP") is in accordance with the standards for accuracy under FCRA and Privacy Act.  49 U.S.C. § 31150(b)(1), (4); Consolidated Complaint Count I; JA 23.

- Defendants have failed to establish standards, policies and procedures to assure that data received into the MCMIS database is accurate.  49 U.S.C. § 31106(a)(4)(A); Consolidated Complaint Count III; JA 26.

- Defendants have failed to prescribe technical and operational standards to assure accurate and complete information collection and reporting by the states to the MCMIS database.  *Id.*

- Defendants have failed to perform its statutory obligations to assure accuracy of MCMIS data and has failed to undertake any independent investigation, assessment or evaluation with respect to state disposition of driver DataQs challenges.  49 U.S.C. §§ 31106(a)(3)(F),

4

31106(a)(4)(A), 31150(b)(1), (4); Consolidated Complaint Counts I, III and IV; JA 28.

- Defendants have failed to provide effective procedures under DataQs for commercial motor vehicle drivers to correct inaccurate information in a timely manner. 49 U.S.C § 31150(b)(4); Consolidated Complaint Counts I, III and IV; JA 23, 26, 28.

- Defendants have failed to prevent dissemination of driver-related inspection reports identifying violations not determined to constitute serious driver-related violations. 49 U.S.C. § 31150(d); Consolidated Complaint Count II; JA 25.

- Defendants' have failed to institute and follow reasonable procedures to assure maximum possible accuracy with respect to information disseminated from MCMIS and have failed to institute and follow reasonable procedures to correct inaccurate information maintained in their records systems as required by FCRA. 15 U.S.C. § 1681 *et seq.*; Consolidated Complaint Count V; JA 30.

Each individual Plaintiff was issued a citation by a state enforcement official. Each Plaintiff then successfully challenged the state citation in a state court, and in each instance, the alleged violations of law were dismissed by the state court or the driver was found not guilty of the alleged violation. Plaintiff drivers then availed themselves of all procedures allowed by Defendants for the correction of inaccurate records requesting the removal of reference to the alleged violations of law from the MCMIS database. Each Plaintiff driver provided proof to FMCSA, through DataQs, that the alleged violations were dismissed by a state court or the driver was found not guilty of the alleged offense. Defendants verified that Plaintiff drivers' alleged violations of law were each either dismissed by a

5

state court or was adjudicated not guilty. Nevertheless, Defendants refused to remove the violations from the MCMIS database rendering the record inaccurate. The inaccurate records with respect to each individual Plaintiff remain in the MCMIS database.

The record in this matter demonstrates that, throughout the proceedings in the District Court in this matter, Defendants continued to apply the same procedures which failed to assure the accuracy of the safety records of commercial truck drivers, including the individual Plaintiffs in this action.  Defendants continued to maintain the inaccurate/false records of "violations" in their database and continued to make these records available to prospective employers through the pre-employment screening program ("PSP").  As long as Defendants maintain the inaccurate records of safety regulation violations in the database, Defendants expose Plaintiffs to a material risk of harm contrary to their statutory rights to accuracy created under 49 U.S.C. §§ 31106(a)(3)(F), (a)(4)(A), & 31150(b)(1); the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*; and the Privacy Act, 5 U.S.C. § 552a. The inaccurate records pose an imminent threat to Plaintiffs' business reputation as a reliable safety risk, crucial to a commercial driver's employment prospects. Regardless of whether a record of the violations existing at the time this action was initially filed in the District Court remain available for dissemination through PSP, the record remains permanently in the MCMIS database.

6

Defendants' statutory obligations to ensure accuracy, and the deficient regulatory procedures applied by Defendants to carry out their obligations, remain unchanged. Defendants continue to apply the same policy of inaction in the face of demonstrated inaccuracy of records in MCMIS upon proof of dismissal or adjudication of not guilty, exposing Plaintiffs to the same material threat of harm to their safety records. As a result, Plaintiffs have demonstrated the concrete and particularized injury necessary to establish their standing to bring the claims in this action.

Plaintiffs' claims are redressable by an Order from this Court or on remand to the District Court: (1) declaring Defendants' obligations and Plaintiffs' rights with respect to the assurance of the accuracy of information maintained in MCMIS as required by 49 U.S.C. §§ 31106(a)(3)(F), (a)(4)(A) & 31150(b)(1); the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*; and the Privacy Act, 5 U.S.C. § 552a; (2) enjoining Defendants from maintaining and disseminating any inaccurate information to third parties; and (3) compelling Defendants to purge from the MCMIS database any record of a safety violation for which there is no judicial determination of the driver's guilt.

Plaintiffs appeal the District Court's dismissal of their claims for lack of standing on a finding that Plaintiffs failed to allege or demonstrate any concrete harm as a result of Defendants' actions. Plaintiffs have standing to maintain their

7

claims for declaratory and injunctive relief with respect to the violation of their statutory rights to the accuracy of information relating to their safety violation information maintained in Defendants' records systems.

## B.     Statutory and Regulatory Background

### 1.     Regulation of Commercial Motor Vehicle Safety

Commercial motor vehicle operators (drivers) are subject to federal motor carrier safety regulations (FMCSRs) promulgated by the FMCSA.  49 C.F.R. Parts 350-399.  The FMCSRs are enforced primarily by individual states which, in exchange for federal grants under the Motor Carrier Safety Assistance Program (MCSAP) (*See* 49 U.S.C. § 31102; 49 C.F.R. Part 350), incorporate federal standards into state law.  States participating in MCSAP are required to report enforcement actions to FMCSA.  49 U.S.C. § 31102(c)(P).  Add. 17.  The MCMIS database contains reports of all enforcement actions submitted by the participating states without regard to the relative seriousness of the infractions involved.

Federal statutes impose specific duties on the regulatory authorities with respect to the accuracy of the MCMIS records.  49 U.S.C. §§ 31106(a)(3)(F), (e)(1),  31150(b)(1), (4).  Add. 31-32. Section 31106(e)(1), Add. 29. specifically requires the Secretary to conform its data systems to the standards applicable under Federal information laws, including both the Privacy Act and the Fair Credit Reporting Act.

**(e)(1) Information availability and privacy protection policy—** The Secretary shall develop a policy on making information available from the information systems authorized by this section and section 31309. The policy shall be consistent with existing *Federal information laws,* including regulations, and shall provide for review and correction of such information in a timely manner. (Emphasis added)

Section 31150(b)(1), (4) Add. 31, 32 provides the same requirement for data maintained by Defendants under the PSP program.

The standards of accuracy imposed under Federal information laws are very exacting. The Fair Credit Reporting Act imposes upon Defendants the duty to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates" and to refrain from disseminating or causing to be disseminated data that they know to be inaccurate. 15 U.S.C. §§ 1681e(b), 1681i(a), 1681c(f). Add. 73, 76, 70. The Privacy Act requires Defendants to "maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights or opportunities of, or benefits to the individual that may be made on the basis of such record." 5 U.S.C. § 552a(g)(1)(C). Add. 42. The Privacy Act goes on to state that "(e)ach agency that maintains a system of records shall… (5) maintain all records which are used by the agency in making any determination about any individual with **such accuracy**, relevance, timeliness, and completeness **as is reasonably necessary to assure fairness** to the individual in the

9

determination; (6) prior to disseminating any record about an individual to any person other than an agency… make reasonable efforts to assure that such records are **accurate, complete, timely, and relevant** for agency purposes….” 5 U.S.C. §§ 552a(e)(5), (6). (Emphasis added). *Id.* These requirements for accuracy are consistent with those associated with the creation of the underlying MCMIS database. *Compare* 49 U.S.C. §§ 31106(a)(3)(F) & 31150(b). Add. 27 & 31.

## 2.   DataQs

The Secretary is required to *establish and implement* a procedure for drivers to correct inaccurate information in a timely manner. The procedure used by FMCSA to correct inaccurate information included in the MCMIS database is called the “DataQs” system. “Requests for Data Review” under the DataQs system are referred to as “RDRs.” The Secretary is directed by statute to require states receiving grants under MCSAP to “participate” in the federal data correction program. 49 U.S.C. § 31102(c)(P). Add. 17. The word “participate” is significant. Under Section 31106(a)(3)(G) the Secretary has the statutory responsibility to “establish and implement a national motor carrier safety data correction system.” Add. *Id.* Thus, by statute, states *participate* in the data correction process while the Secretary has the statutory responsibility to “*establish and implement*” the data correction system. Further, it is the Secretary’s responsibility to “prescribe technical and operational standards to ensure –

10

uniform, timely and accurate information collection and reporting by the States….”
49 U.S.C. § 31106(a)(4)(A).  Add. 27.  No statute authorizes the Secretary to
delegate this statutory responsibility for accuracy and uniformity to the states
participating in MCSAP.  MCMIS data is shared with a number of FMCSA
systems concerned with motor carrier and driver safety in addition to dissemination
under the Preemployment Screening Program (PSP).  *See* FMCSA System of
Records Notice (MCMIS), 74 Fed. Reg. 66391-04 (Dec. 15, 2009).

### 3.    DataQs User Guide and Manual

In January 2011, FMCSA published the “DataQs User Guide and Manual”
(“User Guide”).  JA 117.  This User Guide was not promulgated pursuant to notice
and comment rulemaking.  It does not have the force and effect of law.  It recites
certain policies and practices employed by FMCSA; it does not create legal
authority for use of those policies and practices.  The User Guide was used by
FMCSA during the period when the causes of action alleged by the Plaintiff
drivers arose.  According to the User Guide, “while FMCSA maintains MCMIS
and disseminates the data contained therein, each state’s lead MCSAP agency is
considered the ‘owner’ of all CMV crash and inspection data generated by its
agency and/or sub-agencies.  JA 128.  The state MCSAP agency is responsible for
reviewing and resolving all RDRs or disputes pertaining to the collection and

11

reporting of state-reported safety data into MCMIS.  The state submits data to the state SAFETYNET system, which uploads the data into MCMIS."  JA 128.

FMCSA has washed its hands of any responsibility for determining the accuracy of MCMIS records generated by the states.  FMCSA "undertakes no investigating assessment, or evaluation of the accuracy of such [MCMIS] data." Consolidated Compl. and Answer ¶ 54, admitted.  JA 11.  "FMCSA considers the state's determination of the validity of an RDR as the final decision on the RDR. FCMSA will not unilaterally change state records without state consent." JA 149. A "DataQs Fact Sheet" published by FMCSA states that "The system does not allow or require FMCSA intervention in the State data correction process."  JA 90. The User Guide goes on to state that "[i]f a State Enforcement Official cites a driver for a violation, writes a citation, and then later the citation is dismissed by a judge, the state does not have to remove the violation from the inspection report." JA 143.

### 4.    DataQs 2014 Interpretive Rule

On June 5, 2014, FMCSA published an Interpretive Rule and Policy Statement, 79 Fed. Reg. 32491 (June 5, 2014).  JA 390-395.  The Interpretive Rule stated that a new data field would be created within MCMIS where adjudicated results of citations could be reported by the states.  JA 394.  FMCSA's Interpretive Rule specifically stated that "the Agency has determined that it will not apply this

policy retroactively." JA 391. Thus, FMCSA's corrective action is not being

applied retroactively to the putative violations identified by the Plaintiff drivers

here. The new policy applies only to inspection reports issued after August 23,

2014. JA 394. The Interpretive Rule leaves responsibility for all data correction in

the hands of the States. Nothing in the 2014 publication acknowledges FMCSA's

statutory obligation to assure the accuracy of the information in its records systems

nor changes FMCSA's policy abdicating its responsibility for the accuracy of

safety violation records in MCMIS.

## C.    Statement of Facts

Plaintiff Owner-Operator Independent Drivers Association, Inc. ("OOIDA")

is a non-profit corporation organized under the laws of the State of Missouri with

its principle place of business located in Grain Valley, Missouri. JA 267. The

purpose of OOIDA is to represent the interests of professional truck drivers and

small business trucking companies before federal and state agencies, courts and

legislative bodies. OOIDA has over 150,000 members residing in each of the fifty

states. JA 267. OOIDA appears here in a representative capacity and seeks relief

on behalf of its members.

The individual Plaintiffs, Brian Kelley, Robert Lohmeier, Klint Mowrer,

James Moody and Fred Weaver, are commercial truck drivers and are members of

OOIDA. Each of the individual Plaintiffs were issued at least one citation by a

13

state enforcement official.  JA 200 (Kelley); JA 110, 324 (Lohmeier); JA 103-104

(Mowrer); JA 259-260(Moody); JA 638 (Weaver).  Certain of the citations issued

to Plaintiffs have been codified as criminal offenses under the laws of the states

issuing the citations. Consolidated Compl. ¶¶ 58, 103, 127; (JA 12, 18, 21).  The

Plaintiffs challenged their citations in a state court of competent jurisdiction and in

each case the state court either dismissed the citation or found the Plaintiff not

guilty.  JA 199, 223, 211, 289, 333, 374.

        The inspection "violation" reports relating to Plaintiffs were transmitted by

the respective state law enforcement authorities to the MCMIS database.  JA 196,

197, 201, 202, 334, 335, 384, 385, 386, 387.  Plaintiffs Kelley, Lohmeier, Mowrer,

and Weaver filed an RDR through FMCSA's DataQs system challenging the

"violation" based on the fact that each violation had been dismissed by a state

court of competent jurisdiction.   JA 196, 197, 201, 202, 212, 326, 327, 372, 373.

In each case, FMCSA forwarded the RDR to the <u>state</u> personnel designated to

respond to DataQs challenges, and in each case the state agency rejected each

Plaintiff's challenge and communicated the denial of the challenge to FMCSA.  JA

196, 197, 202, 372, 373, 212, 327.  The safety records for Mower and Weaver

were requested by and disseminated to third parties.  JA 405.

        In a letter dated July 8, 2011, OOIDA President Jim Johnston wrote to then

FMCSA Administrator Anne S. Ferro.  JA 205-228.  In his letter, Johnston

specifically requested that the inspection reports challenged by OOIDA members Kelley, Lohmeier and Mowrer "be removed from all FMCSA databases."  JA 208. He also stated that alleged violations that have "no legal merit . . . . unfairly, and perhaps unlawfully, tarnish [the driver's] safety records and reputations."  JA 208.

After receiving no response from FMCSA, Johnston wrote again to Administrator Ferro on November 18, 2011, pointing out that "for these drivers, the damage that this system has done is immediate and continuing.  These drivers, and others like them, deserve immediate relief from being tagged by FMCSA with legally unsubstantiated and unproven violations of the safety rules."  JA 229.

Administrator Ferro replied to Johnston by letter dated February 17, 2012. JA 253-256.  In her letter, Administrator Ferro refused to remove the reports of violations of law challenged by Kelley, Lohmeier and Mowrer from the FMCSA database.  JA 253.  Administrator Ferro stated that she forwarded the DataQs challenges "to the FMCSA division administrators in the respective states for review."  JA 253.

In a letter dated May 29, 2012, Administrator Ferro wrote to Johnston reporting back the "findings" of the FMCSA Division Administrators regarding the DataQs challenges.  JA 257-258.  According to Administrator Ferro, the FMCSA Division Administrators from Maryland, Arizona and Texas, (the states in which Plaintiffs received citations),  reviewed the respective challenge and, in each case,

15

the Division Administrator refused to remove the overturned "violation" of law from the MCMIS database.  JA 257.

**D.    Procedural History**

      This action was originally commenced in the District Court in July, 2012. *Owner-Operator Independent Drivers Association v. Ferro,* CA No. 12-1158 (D.D.C.).   In September of 2012, Defendants moved to dismiss the action arguing that the district court lacked jurisdiction.  (D.D.C. ECF Doc. # 8).  Defendants asserted that because the action might involve the interpretation of the agency's regulations, the Hobbs Act vested original jurisdiction in the Court of Appeals. 28 U.S.C. § 2342(3).  In May 2013, OOIDA and Fred Weaver filed a protective appeal in this Court to ensure that, if Defendants were correct in their assertion in the District Court that exclusive jurisdiction resided in the Court of Appeals, the challenge to Defendants' deficient data protection procedures would be heard. *Weaver v. FMCSA,* No. 13-1172.   Recognizing that the petition for review in the Court of Appeals was "virtually identical" to the issues raised in the District Court, District Judge Howell entered a stay of proceedings, pending resolution of the petition for review in the Court of Appeals (ECF Doc. # 25).

      In *Weaver,* Petitioners sought to enjoin FMCSA from maintaining and disseminating overturned or dismissed citations.  The Petition challenged FMCSA's denial of Weaver's DataQs request to remove a traffic citation from the

MCMIS database after the citation had been dismissed by a Montana state court. This Court declined to reach the merits of the Petition, finding that it did not have jurisdiction under the Hobbs Act. *Weaver v. FMCSA,* 744 F.3d 142 (D.C. Cir. 2014). This Court held that because FMCSA's action fell short of being a rule, regulation or final order within the meaning of the Hobbs Act, the Court lacked jurisdiction, and transferred the action to the District Court to resolve the claims raised. *Id.* at 148.

In April 2014, the District Court consolidated the remanded *Weaver* action, CA No. 14-548 with CA No. 12-1158, and Plaintiffs filed an Amended Complaint ("Consolidated Complaint") combining the allegations in the two actions (ECF Doc. #35). In June 2014, Defendants moved to dismiss the Amended Complaint. The District Court denied the motion, recognizing that "the major issue to be decided in this matter…[is] whether the defendants are maintaining inaccurate information *in the MCMIS*." (ECF Doc. # 46 at 7). The District Court found that it could not resolve the threshold issue of Plaintiffs' standing, because the administrative record was incomplete. *Id.*

Defendants subsequently filed an administrative record with the District Court. (ECF ## 49, 59). In July 2015, Defendants moved for summary judgment contending, among other issues, that Plaintiffs lacked standing.

17

## E.    Ruling Presented for Review

The District Court granted summary judgment to Defendants finding that

Plaintiffs had failed to establish a concrete injury-in-fact and therefore lacked

Article III standing to bring this action.  *Owner-Operator Indep. Drivers Ass'n v.*

*U.S. Dept. of Transp.,* 2016 WL 5674626 (Sept. 30, 2016).  The District Court

purported to apply controlling authority from the Supreme Court and this Circuit in

*Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547 (2016) and *Hancock v. Urban*

*Outfitters, Inc.*, 830 F.3d 511, 514-15 (D.C. Cir. 2016), interpreting those cases as

announcing a bright-line rule precluding standing where injury-in-fact is based

solely upon the invasion of rights created by statute. 2016 WL 5674626 at *6.

According to the District Court, *Spokeo* and *Hancock* "squarely rejected" that

formulation of injury-in-fact. *Id.* (citing *Hancock*, 830 F.3d at 514).  The District

Court acknowledged that the record contained facts demonstrating that Plaintiffs

had successfully challenged the state law violations, obtaining either a dismissal or

an adjudication of not guilty for the citations, and had attempted to secure the

correction of their safety records to reflect those results through all available

procedures including DataQs and a direct appeal to the Administrator of FMCSA.

2016 WL 5674626 at *2-3.  Nevertheless, as the record reflects, FMCSA refused

to correct the Plaintiffs' safety records maintained in MCMIS, and the inaccurate

reports of safety violations, including violations coded as criminal offenses,

18

remained in the MCMIS system of records. *Id.*

The District Court concluded that by arguing that they had standing by virtue of their statutory right to accuracy in the records maintained by the government, Plaintiffs had alleged nothing more than a bare procedural violation, divorced from any concrete harm, and found that Plaintiffs lacked standing. 2016 WL 5674626 at *7. The District Court held: "Having concluded that the plaintiffs do not have standing to bring their claims, the Court lacks subject-matter jurisdiction to resolve the merits of the parties' pending cross-motions for summary judgment and the plaintiffs' discovery motion, and must instead dismiss the plaintiffs' complaint." *Id.*

Plaintiffs appeal the District Court's ruling that they lack Article III standing and the court's consequent dismissal of their claims.

## SUMMARY OF ARGUMENT

The District Court erred in finding that the Supreme Court in *Spokeo*, and this Circuit in *Hancock* redefined the standard for Article III standing by rejecting the sufficiency of injury-in-fact based solely upon the invasion of a legally protected interest created by statute. To the contrary, both courts reaffirmed the traditional formulation of injury-in-fact. The Supreme Court explained that Congress, by statute, has the power to identify injuries that give rise to the required Article III case or controversy where none existed before, such that the mere

19

violation of the statutory right constitutes injury-in-fact without any allegation of additional harm beyond that identified by Congress.

Congress has explicitly undertaken to protect commercial motor vehicle drivers from the damaging consequences of inaccurate safety records by limiting the types of information that can be reported, by requiring accuracy of that data, and by requiring the Secretary to establish and implement a national motor carrier safety data correction system. 49 U.S.C §§ 31106(a)(3)(G), 31150(a) & (b). Plaintiffs have a concrete interest in the accuracy of their safety records and the reflection those records project of their safety risk to potential employers. In operating its commercial motor vehicle safety information system, Defendants must maintain its data to ensure, to the maximum extent practical, all the data is complete, timely, and accurate. *Id.* § 31106(a)(3)(F). Under Section 31150 Congress required FMCSA to "ensure" that that before providing a person access to MCMIS data through the pre-employment screening program, any information released to a motor carrier will be in accordance with the FCRA (15 U.S.C. 1681 *et seq.*) and all other Federal law, including the Privacy Act, 5 U.S.C. § 552a. These federal information laws require that responsible federal authorities ensure the accuracy of information maintained and disseminated through its records systems.

The record in this case establishes that Plaintiffs suffered personalized and concrete harm as a result of Defendants violation of their statutory interest in the

accuracy of their safety records. Each individual Plaintiff was issued a citation for a safety regulation violation, all of which were either dismissed or the Plaintiff was adjudicated not guilty in state court. Plaintiffs availed themselves of all procedures allowed by Defendants for the correction of the inaccurate safety records in Defendants' data systems. Defendants refused to remove the inaccurate records from the database, and the inaccurate records remain in MCMIS. Defendants' statutory obligations to ensure accuracy, and the deficient regulatory procedures applied by Defendants to carry out their obligations, remain unchanged. Defendants continue to apply the same policy of inaction in the face of demonstrated inaccuracy of records in MCMIS upon proof of dismissal or adjudication of not guilty, exposing Plaintiffs to the same material threat of harm to their reputation as a reliable safety risk and to their prospects for employment. As a result, Plaintiffs have demonstrated the concrete and particularized injury necessary to establish their standing to bring the claims in this action.

This Court should reverse the District Court's dismissal of Plaintiffs' claims for lack of standing and remand to the District Court to address the merits of Plaintiffs' claims.

# ARGUMENT

## I.      STANDARD OF REVIEW

This Court reviews the District Court's decision as to standing *de novo*. *Scenic America, Inc., v. U.S. Dept. of Transp.,* 836 F.3d 42, 49 (D.C. Cir. 2016), citing *Info. Handling Servs., Inc. v. Def. Automated Printing Servs.,* 338 F.3d 1024, 1029 (D.C. Cir. 2003).  The party asserting jurisdiction bears the burden of establishing standing. *Scenic America,* 836 F.3d at 48 (citing *Lujan v. Defenders. of Wildlife*, 504 U.S. 555, 561 (1992)). At the summary judgment stage, the assertion of jurisdiction must be supported by specific facts in the record demonstrating standing. *Id.*

## II.      THE DISTRICT COURT ERRED IN FINDING THAT THE SUPREME COURT IN *SPOKEO* AND THIS CIRCUIT IN *HANCOCK* REDEFINED THE REQUIREMENTS FOR INJURY-IN-FACT

Contrary to the ruling of the District Court in this matter, the Supreme Court in *Spokeo* and this Circuit in *Hancock* **did not reject** a finding of sufficient injury-in-fact based solely upon the deprivation of a statutory right.  Just the opposite.  In *Spokeo,* the Court found:

> Just as the common law permitted suit in such instances [e.g. libel, slander *per se*], the violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact. In other words, a plaintiff in such a case need not allege any *additional* harm beyond the one Congress has identified.

136 S. Ct. at 1549 (emphasis in original, citations omitted). In *Hancock*, applying *Spokeo,* this Court recognized the continuing viability of the holding in *Warth v. Seldin*, 422 U.S. 490 (1975), that "'actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing.'" 830 F.3d at 514 *quoting *Warth*, 442 U.S. at 500). But this Court noted that the plaintiffs had "vastly overread that case." *Id.* In *Hancock*, the Court found that the facts in that case exactly mirrored the example of a statutory violation that could "result in no harm" singled out by the Supreme Court in *Spokeo. Id.* "'It is difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm.'" *Id.* (quoting *Spokeo,* 136 S. Ct. at 1549). Thus, this Circuit held that an allegation of "a mere request for a zip code, standing alone, [did not] amount [ ] to an Article III injury." *Id.*

In *Spokeo,* the Supreme Court reaffirmed the traditional elements necessary to establish Constitutional standing. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo,* 136 S. Ct. at 1548 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. at 560). The Supreme Court then highlighted two elements necessary to establish injury in fact—concreteness and particularization—and explained that the two must be addressed separately. *Id.* at 1545. The Ninth Circuit had addressed

23

"particularization" but not "concreteness." *Id.* The Supreme Court, therefore,

provided guidance as to what constituted a "concrete" injury.

For an injury to be concrete, the Court explained, it must be "'real,' and not

'abstract.'" *Id.* (citations omitted). But an injury can be "real" even if it is not

"'tangible.'" *Id.* at 1549. "In determining whether an intangible harm," such as one

that may result from the violation of federal statute, "constitutes injury in fact, both

history and the judgment of Congress play important roles." *Id.* The Court affirmed

that "Congress is well positioned to identify intangible harms that meet minimum

Article III requirements," and has the power to "'define injuries and articulate

chains of causation that will give rise to a case or controversy where none existed

before.'" *Id.* (quoting *Lujan*, 504 U.S. at 580 (Kennedy, J., concurring in part and

concurring in the judgment)). Likewise, "[b]ecause the doctrine of standing derives

from the case-or-controversy requirement, and because that requirement in turn is

grounded in historical practice, it is instructive to consider whether an alleged

intangible harm has a close relationship to a harm that has traditionally been

regarded as providing a basis for a lawsuit in English or American courts." *Id.*

(quoting *Vt. Agency of Nat. Res. v. United States ex rel. Stevens,* 529 U.S. 765,

775-77 (2000)).

A plaintiff does not automatically satisfy the injury-in-fact requirement

whenever a statute grants a right and purports to authorize an action to vindicate

that right. *Id.* A plaintiff cannot "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id.* (quoting *Summers v. Earth Island Inst.,* 555 U.S. 488, 496 (2009)); *Lujan*, 504 U.S. at 572). There must be at least "the risk of real harm" to the interest protected by Congress to "satisfy the requirement of concreteness." *Id.* (quoting *Clapper v. Amnesty Int'l USA,* 133 S. Ct. 1138 (2013)). But the Supreme Court in *Spokeo* was clear that "the violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact" and, in those circumstances when it is, a plaintiff "need not allege any *additional* harm beyond the one Congress has identified." *Id.* at 1549-50 (quoting *FEC v. Akins*, 524 U.S. 11, 20-25 (1998); *Pub. Citizen v. Dep't of Justice*, 491 U.S. 440, 449 (1989)).

Justice Thomas joined the Court's opinion in full but wrote separately to explain why the ruling remained faithful to Article III's common-law tradition. The Court's decision adhered to the traditional distinction between public and private rights that "persist[ed] in modern standing doctrine." *Id.* at 1553-54 (Thomas, J., concurring). "Historically, common-law courts possessed broad power to adjudicate suits involving the alleged violation of private rights"— that is, "rights belonging to individuals, considered as individuals"—"even when plaintiffs alleged only the violation of those rights and nothing more." *Id.* at 1551 (citation omitted). "Common-law courts, however, have required a further showing

25

of injury for violation of public rights—rights that involve duties owed to the whole community, considered as a community, in its social aggregate capacity." *Id*. (citation and internal quotation marks omitted). In such common-law disputes involving public rights the plaintiff needed to "allege 'special damage'" before "the suit could proceed." *Id*. at 1551-52.

Following that tradition, Article III does not require a "plaintiff seeking to vindicate a statutorily created private right" to "allege actual harm beyond the invasion of that private right." *Id*. at 1553 (quoting *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 373-74 (1982); *Tenn. Valley Elec. Power Co. v. TVA,* 306 U.S. 118, 137-38 (1939)). But Article III requires more when the suit involves a public right:  "Congress cannot authorize private plaintiffs to enforce public rights in their own names, absent some showing that the plaintiff has suffered a concrete harm particular to him." *Id.*  However, where a statute "establishe[s] a private cause of action to vindicate the violation of a privately held right," violation of the statutory interest is itself sufficient for injury-in-fact. *Id.* at 1554.  Thus, the FCRA requires "reasonable procedures to assure maximum possible accuracy of the information *concerning the individual about whom the report relates.*" *Id.* (emphasis in original).  "If Congress has created a private duty owed personally to Robins to protect *his* information, then the violation of the legal duty suffices for Article III injury in fact." *Id.* (emphasis in original).

26

### III. COURTS APPLYING *SPOKEO* HAVE REAFFIRMED CONGRESSIONAL POWER TO IDENTITY STATUTORILY DEFINED INTERESTS, THE VIOLATION OF WHICH ALONE ARE SUFFICIENT TO SUPPORT INJURY-IN-FACT

Not one Court discussing *Spokeo* has endorsed the District Court's

unforgiving, conclusory, bright-line application precluding Article III standing

resulting solely from the invasion of statutorily created rights.  Courts applying

*Spokeo* have expressly found that the Supreme Court did not change the traditional

standard for the establishment of standing; and reaffirmed that a violation of a

procedural right granted by statute may, in some circumstances, be a sufficiently

concrete harm, albeit intangible, to constitute injury-in-fact without an allegation

of additional harm beyond that identified by Congress.  *Friends of Animals v.

Jewell,* 828 F.3d 989, 992 (D.C. Cir. 2016); *In re Horizon Healthcare Servs., Inc.

Data Breach Litig.,* 846 F. 3d 625, 637-40 (3d Cir. 2017) *Strubel v. Comenity

Bank,* 842 F.3d 181, 189 (2d Cir. 2016); *Van Patten v. Vertical Fitness Grp.,* 847

F. 3d 1037, 1042-43 (9th Cir. 2017); *Church v. Accretive Health, Inc.,* 654 F. Ap.

990, 993-94 (11th Cir. 2016); *Lee v. Verizon Coomu'ns Inc.,* 837 F.3d 523, 529

(5th Cir. 2016); *Thomas v. FTS USA,* 193 F. Supp. 3d 623, 628-29 (E.D. Va,

2016); *Clark v. Trans Union*, 2016 WL 7197391 at *8 (E.D. Va. Dec. 9, 2016).

This Circuit, ruling on informational standing, found:

As the Supreme Court recently indicated, the existence and scope of
an injury for informational standing purposes is defined by Congress:
a plaintiff seeking to demonstrate that it has informational standing

27

generally "need not allege any *additional* harm beyond the one Congress has identified."

*Friends of Animals,* 828 F.3d at 992 (quoting 136 S. Ct. at 1549).  This Court explained that the statutory injury is sufficient where a plaintiff alleges he has been deprived of information required by statute and has suffered the type of harm Congress sought to prevent by requiring disclosure.  *Id.*  "In some instances, a plaintiff suffers the type of harm Congress sought to remedy when it simply seeks and is denied specific agency records."  *Id.* (internal quotation marks and citation omitted).  In *Friends of Animals,* plaintiffs alleged injury as a result of the violation of a statutorily mandated deadline. 828 F.3d at 992.  Standing was denied not because an injury could not be made out for violation of statutory rights alone, but because the statute did not require the disclosure of any information at the time of the cited deadline.  *Id.* at 993-94.

The Third Circuit, in *Horizon Healthcare*, explained:

*Spokeo* itself does not state that it is redefining the injury-in-fact requirement. Instead, it reemphasizes that Congress "has the power to define injuries, … that were previously inadequate in law."… In the absence of any indication to the contrary, we understand that the *Spokeo* Court meant to reiterate traditional notions of standing, rather than erect any new barriers that might prevent Congress from identifying new causes of action though they may be based on intangible harms.

846 F. 3d at 638 (quoting *Spokeo,* 136 S. Ct. at 1549).  In that case, two laptop computers containing the unencrypted personal information of the named Plaintiffs

28

and more than 839,000 other Horizon members were stolen from Horizon's

headquarters. *Id.* At 630. The computers may have included personal information

of Horizon members, and there was no allegation that the personal information

contained on the stolen computers was actually disseminated beyond the data

breach resulting from the theft of the computers. *Id.* The Third Circuit found that

the plaintiffs had standing based upon a violation of their statutory rights under

FCRA to protection from unauthorized disclosure of their private information. *Id.*

At 640-41. The Court found:

> No common law tort proscribes the release of truthful information that
> is not harmful to one's reputation or otherwise offensive. But with the
> passage of FCRA, Congress established that the unauthorized
> dissemination of personal information by a credit reporting agency
> causes an injury in and of itself—whether or not the disclosure of that
> information increased the risk of identity theft or some other future
> harm.

*Id.* At 639. The Third Circuit held that the injury alleged was injury that FCRA

was intended to prevent; not "a mere technical or procedural violation of FCRA"

but a "*de facto* injury that satisfies the concreteness requirement for Article III

standing." *Id.* at 640. *See also In re Nickelodeon Consumer Privacy Litig.,* 827

F.3d 262, 272-73 (3d Cir. 2016), (quoting *In re Google Inc. Cookie Placement*

*Consumer Privacy Litig.*, 806 F.3d 125, 134 (3d Cir. 2015) ("[W]hen it comes to

laws that protect privacy, a focus on 'economic loss is misplaced.' Instead, in some

cases an injury-in-fact 'may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing.'")).

Similarly, the Second Circuit stated that it "d[id] not understand *Spokeo* categorically to have precluded violations of statutorily mandated procedures from qualifying as concrete injuries supporting standing." *Strubel*, 842 F.3d at 189. The Court found instructive the inquiry as to whether a procedural right created by statute was intended to protect an individual's concrete interests. *Id.* In that circumstance, the Court stated, "a violation of the procedure may demonstrate a sufficient 'risk of real harm' to the underlying interest to establish concrete injury without 'need [to] allege any *additional* harm beyond the one Congress has identified.'" *Id.* (quoting *Spokeo,* 136 S.Ct. at 1549). Thus, the Second Circuit concluded:

> [W]e understand Spokeo, and the cases cited therein, to instruct that an alleged procedural violation can by itself manifest concrete injury where Congress conferred the procedural right to protect a plaintiff's concrete interests and where the procedural violation presents a "risk of real harm" to that concrete interest.

*Id.* at 190 (quoting *Spokeo,* 136 S. Ct. at 1549). The *Strubel* Court found that certain disclosure requirements under the Truth-in-Lending Act were intended to protect "a consumer's concrete interest in 'avoid [ing] the uninformed use of credit,' a core object of the TILA. *Id.* The violation of such notice requirement, by itself, gives rise to a "risk of real harm" to the consumer's concrete interest in

the informed use of credit. *Id.* The *Strubel* Court then held that "[h]aving alleged

such procedural violations, Strubel was not required to allege "any *additional*

harm" to demonstrate the concrete injury necessary for standing. *Id.* at 191 (citing

*Spokeo,* 136 S.Ct. at 1549).

In *Thomas,* the district court found that "*Spokeo* did not change the basic

requirements of standing." 193 F. Supp. 3d at 629. The *Thomas* Court noted that

in certain circumstances, like the disclosure of private information or defamatory

falsehoods, there is no need to show "'downstream consequences'" to demonstrate

harm; "'[P]roving the injury in many of these cases just entails proving the

violation itself—certain words were spoken, certain information disclosed, or

certain procedures flouted.'" *Id.* at 639 (quoting Daniel Townsend, *Who should*

*Define Injuries for Article III Standing,* 68 Stan. L. Rev. Online 76, 80-81 (2015)).

The Court concluded "the proposition that '[t]he... injury required by Article III

may exist solely by virtue of 'statutes creating legal rights, the invasion of which

creates standing' survives *Spokeo* subject to qualification, depending on the facts

of each case and the considerations articulated above, but nevertheless intact." *Id.*

at 631 (quoting *Warth,* 422 U.S. at 500). The Court found that "Congress intended

that the FCRA be construed to promote the credit industry's responsible

dissemination of accurate and relevant information and to maintain the

confidentiality of consumer reports." *Id.* at 633. The Court found that the

31

plaintiffs had standing to pursue claims for defendant's failure to provide certain

disclosures and obtain written consent before obtaining plaintiffs consumer reports

for employment purposes—the procedural rights intended to effect the FCRA's

purposes of confidentiality and privacy. *Id.* at 635-37.  *See also Trans Union*, 2016

WL 7197391 at *8-11. Holding that the FCRA's disclosure requirements are

intended to facilitate the purpose of correcting any erroneous information in one's

credit file, and that violation of the disclosure requirements, risking dissemination

of inaccurate information alone, can support a concrete injury sufficient to

establish standing); *Van Patten,* 847 F.3d at 1042-43 (holding that TCPA

establishes right to be free from certain types of phone calls absent consent;

plaintiff alleging a violation of TCPA need not allege any additional harm beyond

receipt of phone call to establish standing); *Church*, 654 F. App'x at 993-94

(holding that failure to provide required disclosure under FDCPA, without more,

constitutes legally cognizable injury which satisfies injury-in-fact requirement.)

## IV.  THE STATUTORY VIOLATIONS PLAINTIFFS ALLEGE ARE SUFFICIENTLY CONCRETE TO SUPPORT STANDING

In 49 U.S.C §§ 31106(a)(3)(G) and 31150(a) & (b), Congress explicitly

undertook to protect commercial motor vehicle drivers from the damaging

consequences of  inaccurate safety records by limiting the types of information that

could be reported, by requiring accuracy of that data, and by requiring the

Secretary to establish and implement a national motor carrier safety data correction

system.  Plaintiffs have a concrete interest in the accuracy of their safety records

and the reflection those records project of their safety risk to potential employers.

In operating its commercial motor vehicle safety information system, the Secretary

"shall develop and maintain… data analysis capacity and programs that provide the

means to**… ensure, to the maximum extent practical, all the data is** complete,

timely, and **accurate** across all information systems and initiatives..."  49 U.S.C. §

31106(a)(3)(F) (emphasis added).  These statutory commands expressly require the

Secretary to ensure that the standard of accuracy meets that consistent with

"existing federal information laws."  *Id.*  Under Section 31150 Congress required

FMCSA to "ensure" that, "[b]efore providing a person access to MCMIS data

through the pre-employment Screening Program," that any information that is

released to a motor carrier "will be in accordance with the Fair Credit Reporting

Act (15 U.S.C. 1681 *et seq*.) and all other Federal law."  *Id.* §§ 31150(b), (b)(1).

Congress, by requiring dissemination of PSP data "be in accordance with" the

FCRA, has held FMCSA's actions to the standards imposed under the FCRA.  In

addition, the statute also requires that the release of PSP data be in accordance with

"all other Federal law," which would include the Privacy Act, 5 U.S.C. § 552.

These federal information laws require that responsible authorities ensure the

accuracy of information before dissemination.

*Spokeo* reaffirms that "intangible" injuries, including exposure to a "risk of real harm," can satisfy Article III's concrete injury requirement. 136 S. Ct. at 1549. It also confirms that "Congress has the power to define injuries" that will support an individual's standing to sue. *Id.* The Court explained that in determining whether an intangible harm constitutes injury-in-fact, "both history and the judgment of Congress play important roles." *Id.* The inquiry turns (as it always has) on whether Congress has created a ***legally protected interest.*** *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560). The *Spokeo* Court further noted that "it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* at 1549 (citing *Vt. Agency of Nat. Res.,* 529 U.S. at 775-777)

Plaintiffs' statutorily protected concrete interest in the accuracy of information collected and maintained for dissemination in Defendants' records systems is expressly grounded in the same standards applicable under the FCRA and Privacy Act. 49 U.S.C §§ 31106(a)(3)(G), 31150(a) & (b). A central purpose of the FCRA is "to ensure 'fair and accurate credit reporting.'" *Spokeo,* 136 S. Ct. at 1545 (quoting 15 U.S.C. § 1681(a)(1)). Through the FCRA, "Congress plainly sought to curb the dissemination of false information by adopting procedures designed to decrease that risk." *Spokeo,* 136 S. Ct. at 1550. Congress established

34

that the unauthorized dissemination of personal information by a reporting agency causes an injury in and of itself regardless of any additional harm resulting from the breach. *Horizon Healthcare*, 846 F.3d at 638. "Congress intended that the FCRA be construed to promote the credit industry's responsible dissemination of accurate and relevant information and to maintain the confidentiality of consumer reports." *Thomas,* 193 F. Supp 3d at 633; *Trans Union,* 2016 WL 7197391, at *8. Congress also "emphasized that 'the consumer has a right ... to correct any erroneous information in his credit file" *Thomas,* 193 F. Supp. 3d at 633 (quoting S. Rep. No. 517, 91st Cong., 1st Sess. 2 at 2).

The Supreme Court further found English and American legal tradition to be useful in defining a cognizable intangible harm. *Spokeo,* 136 S. Ct. at 1549. The Court singled out libel and slander *per se* as the kind of intangible harm traditionally recognized even though difficult to prove or measure. *Id.* (citing Restatement (First) of Torts §§ 569, 570 (1938)). The common law of defamation historically recognized that "[t]he publication of any libel … is itself an injury." Restatement (First) of Torts § 569 cmt. c. (1934). Common law thus traditionally permitted those subjected to libel to sue to recover "at least nominal damages," without having to show that "any special harm has been caused to the plaintiff's reputation or otherwise." *Id.* § 569 cmt. C; *see also* Restatement (Second) of Torts § 621 (1977) (noting the "traditional common law rule allowing recovery [for

35

defamation] in the absence of proof of actual harm").  Under the common law of
defamation, written communications were historically actionable without a
showing of actual damages if they "tend[ed] so to harm the reputation of another as
to lower him in the estimation of the community or to deter third persons from
associating or dealing with him." Restatement (First) of Torts §§ 559, 568, 569.
Spoken communications were actionable without a showing of actual damages if
they had a negative imputation such as an allegation of a criminal offense. *Id.* §
570.

The Supreme Court has recognized that the Anglo-American common law
tradition has long permitted claims by those who were the subject of false and
defamatory reports, particularly reports that had the potential to harm their
standing, credit, trade, or business.  Such claims were actionable absent "evidence
of actual loss." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974).  Thus, "the
existence of injury is presumed from the fact of publication." *Id.* The Supreme
Court has explained that because the "experience and judgment of history" is "'that
proof of actual damage will be impossible in a great many [defamation] cases'"
even though "'it is all but certain that serious harm has resulted in fact.'" *Dun &
Bradstreet v. Greenmoss Builders,* 472 U.S. 749, 760 (1985) (quoting W.
Prosser, Law of Torts § 112 (4th ed. 1971)).  "As a result, courts for centuries have
allowed juries to presume that some damage occurred from many defamatory

36

utterances and publications." *Id.* at 760-61 (citing Restatement (First) of Torts §

568, Comment b (1938) (noting that Hale announced that damages were to be

presumed for libel as early as 1670)).

Courts applying the *Spokeo* analysis to the federal information laws have

recognized this legal tradition:

> In these situations, legal rights reflect social judgments about where harm
> has and has not occurred. Often, these kinds of injuries exist where we
> think the harm is in the act itself. The public disclosure of private
> information or defamatory falsehoods does not need downstream
> consequences to be hurtful; neither does differential treatment on the
> basis of race. Procedural wrongs are an oftseen category where the
> distinction between the legal violation and the injury may be so thin as
> to be essentially nonexistent. Proving the injury in many of these cases
> just entails proving the violation itself —that certain words were spoken,
> certain information disclosed, or certain procedures flouted. As a result,
> requiring some sort of additional indicia of harm beyond the violation
> itself ignores the nature of the injury and the reason for the remedy.

*Thomas,* 193 F. Supp. 3d at 630 (quoting Townsend, *supra* at 80-81); *accord*

*Trans. Union,* 2016 WL 7197391, at *9 n 19 (also quoting Townsend, *supra,* at 80-

81). The Eleventh Circuit considering the level of presumed harm sufficient for a

mere procedural violation to support a finding of standing, commented on the

*Spokeo* Court's example of an incorrect zip code:

> For example, the Court found it "difficult to imagine how the
> dissemination of an incorrect zip code, without more, could work any
> concrete harm." But some inaccuracies, such as incorrectly reporting
> that an individual has a criminal history, might cause harm or a material
> risk of harm.

*Nicklaw v. Citimortgage, Inc.,* 839 F.3d 998, 1003 (11th Cir. 2016) (citation

omitted).

## V.     PLAINTIFFS HAVE NOT ALLEGED A BARE PROCEDURAL VIOLATION SEPARATE FROM THE STATUTORILY EXPRESSED INTEREST IN ENSURING ACCURACY IN MCMIS RECORDS

The record in this matter demonstrates that Defendants failed to institute and

enforce reasonable procedures to protect commercial motor vehicle drivers'

concrete interest in the accuracy of their safety records.  As long as Defendants

maintain the inaccurate records of safety regulation violations in the database,

Defendants expose Plaintiffs to a material risk of harm contrary to their concrete

statutory rights to accuracy created under 49 U.S.C. §§ 31106(a)(3)(F), (a)(4)(A),

& 31150(a)-(d); the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*; and the

Privacy Act, 5 U.S.C. § 552a.  The safety violation records maintained by

Defendants in MCMIS are used by motor carriers to evaluate individual drivers for

employment.  Indeed, the express purpose of the PSP program established by

Section 31150 is "to assist the motor carrier industry in assessing an individual

operator's crash and serious safety violation inspection history as a pre-

employment condition." 49 U.S.C. § 31150(c).  Inaccurate safety violation

information weighs heavily on a driver's reputation for safety and consequently on

his prospects for employment. A baseless report of drunk driving or speeding poses

a realistic threat to his prospects for employment as commercial truck driver.

The record in this action establishes that Defendants admit that they accept ambiguous (therefore inaccurate) reports into the MCMIS database. Answer to Amended Compl. ¶ 49 (JA 11). Further, FMCSA admits that it "undertakes no investigation, assessment or evaluation of the accuracy of such data." Answer to Amended Compl. ¶ 54 (JA 11). The facts established below show that the individual Plaintiffs, all commercial truck drivers and members of OOIDA, were each issued at least one safety regulation violation by a state enforcement official. Certain of the citations issued to Plaintiffs have been codified as criminal offenses under the laws of the states issuing the citations. Amended Compl. ¶¶ 58, 103, 127; JA 12, 18, 21. Each Plaintiff successfully challenged the citation in a state court, all citations were either dismissed or adjudicated not guilty. Each Plaintiff attempted to correct his safety violation record retained by Defendants in the MCMIS records through DataQs, the only prescribed regulatory procedure available to Plaintiffs to correct their records. JA 196, 197, 201, 202, 212, 326, 327, 372. Defendants refused to correct the records. JA 196, 197, 202, 372, 373, 212, 327. The safety records for Plaintiffs Mower and Weaver were requested and disseminated to third parties. JA 405.

Thereafter, OOIDA, on behalf of the individual Plaintiffs, attempted to assist in correction of the records, appealing by letter to the Administrator of FMCSA. OOIDA clearly stated to FMCSA the interests at stake for its members as a result

of FMCSA's policy choices to ignore its statutorily mandated duties to ensure the accuracy of the data in its records systems. In July 2011, OOIDA wrote that "alleged violations that have "no legal merit . . . . unfairly, and perhaps unlawfully, tarnish [the driver's] safety records and reputations." JA 208. In November 2011, OOIDA wrote again stating "for these drivers, the damage that this system has done is immediate and continuing. These drivers, and others like them, deserve immediate relief from being tagged by FMCSA with legally unsubstantiated and unproven violations of the safety rules." JA 229. FMCSA refused to take any action to correct the records, stating that the state enforcement agencies had denied Plaintiffs' requests for correction. JA 253, 257-258.

The claims against Defendants for the maintenance and dissemination of inaccurate driver safety records can hardly be compared to the kind of trivial procedural violation held out as an example in *Spokeo,* where the Court commented "not all inaccuracies cause harm or present any material risk of harm. An example that comes readily to mind is an incorrect zip code." 136 S. Ct. at 1549. This Circuit, citing that passage from *Spokeo,* following the Court's signal, found: "The Supreme Court's decision in *Spokeo* thus closes the door on Hancock and White's claim that the Stores' mere request for a zip code, standing alone, amounted to an Article III injury." *Hancock,* 830 F.3d at 514.

Rather, the inaccurate safety violation reports maintained and disseminated

40

relating to Plaintiffs here resemble the example of concrete injury offered by the *Spokeo* Court: "the law has long permitted recovery by certain tort victims even if their harms may be difficult to prove or measure. See, *e.g.*, Restatement (First) of Torts §§ 569 (libel), 570 (slander *per se*) (1938)." *Spokeo,* 136 S. Ct. at 1549. Such defamatory offense has been recognized by several Courts as requiring no allegation of additional harm. *Nicklaw,* 839 F.3d at 1003 (incorrectly reporting that an individual has a criminal history might cause harm or material risk of harm); 193 F. Supp. At 630-31 (defamatory falsehoods require no downstream consequences to be harmful); *Trans. Union,* 2016 WL 7197391, at *9 (same).

In this case, the inaccurate records and deficient procedures for the correction of those records can hardly be dismissed as nothing more than an inaccurate zip code. Safety violation reports bear directly on the critical factors likely to be considered by motor carriers making employment decisions. Drunk driving, hours of service, speeding and the like are the building blocks fundamental to a truck driver's business reputation. Motor carriers evaluating drivers for a job are assessing an individual's risk for safe driving. Inaccurate reporting in Defendants' records systems poses an imminent threat of harm to Plaintiffs' and all commercial drivers' reputational safety. This is precisely the kind of reputational injury traditionally recognized in American law as sufficient without additional proof of harm to support a cause of action for defamation and nominal damages.

41

Each Plaintiff in this case was cited by a state authority for violation of a safety regulation. Certain of those violations were codified under state law as criminal violations. But all reflect on the record and reputation as a safety risk of the individual driver. After each such violation was either dismissed or adjudicated not guilty, the record of the violation maintained in MCMIS became objectively false. Plaintiffs Mower and Weaver were criminally cited. Reports for both of these Plaintiffs were requested and disseminated. At a minimum, the false report of a criminal history for Mower and Weaver constitute the demonstration of the kind of concrete injury sufficient to satisfy Article III standing.

The purpose of the database and the basis for authority to disseminate driver safety records is to assist motor carriers in assessing an individual operator's crash and serious safety violation history in connection with screening for employment. 49 U.S.C. § 31150(c). Commercial vehicle drivers have a concrete interest in presenting an accurate account of their safety records and the safety risk they project to potential employers. Inaccurate reports of safety violations pose a credible and material risk of harm to the employment prospects of drivers seeking a job. FMCSA has totally abdicated its statutory responsibility to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates and to refrain from disseminating or causing to be disseminated data that they know to be inaccurate.

42

49 U.S.C. §§ 31106(a)(3)(F), (e)(1),  31150(b)(1), (4) (incorporating the

requirements of 15 U.S.C. §§ 1681e(b), 1681i(a), & 1681c(f)).  FMCSA admitted

that it had washed its hands of any responsibility for the accuracy of the records

maintained in MCMIS.  Defendants' violation of Plaintiffs' statutory rights is not

the kind of trivial error held up by the Supreme Court as unlikely to cause any

harm.  Rather, the very interest Congress intended to protect is at stake—the

driver's interest in an accurate safety record and report in the service of facilitating

a fair evaluation for the purposes of a decision on his employment.

## VI.     PLAINTIFFS' CHALLENGE TO FMCSA'S CONTINUED POLICY OF INACTION IN ENSURING THE ACCURACY OF DRIVER RECORDS IN MCMIS IS NOT MOOT

As part of its statutory mandate, the FMCSA maintains the MCMIS,

including records containing information on commercial truck drivers' safety

records which includes accident reports and other safety violations. *See Weaver*,

744 F.3d at 143. While the states serve as the primary collectors and reporters to

FMCSA of the data contained in the MCMIS, and are statutorily required to ensure

that this data is "accurate, complete, and timely motor carrier safety data," 49

U.S.C. § 31102(c)(2)(P)(i), DOT is ultimately responsible for "ensur[ing], to the

maximum extent practical, all the data is complete, timely and accurate," and

"prescrib[ing] technical and operational standards to ensure…uniform, timely, and

accurate information collection and reporting by the States." *Id.* §§ 31106(a)(3)(F),

& (a)(4)(A).

FMCSA is statutorily required to make certain information contained in MCMIS electronically available to potential employers of commercial drivers for pre-employment screening, to assist "in assessing an individual operator's crash and serious safety violation inspection history as a pre-employment condition." *Id.* §§ 31150(a) & (c). FMCSA has implemented the pre-employment screening access through a program known as the Pre-Employment Screening Program ("PSP"). JA 105. PSP reports contain MCMIS data for individual drivers regarding the most recent five years' crash data and the most recent three years' inspection history.

FMCSA established DataQs to provide a correction mechanism for violation reports stored in the MCMIS. *Weaver*, 744 F.3d at 143; *see also Silverado Stages, Inc. v. FMCSA,* 809 F.3d 1268, 1271 (D.C. Cir. 2016) (describing DataQs). When a challenge is made to a reported safety violation by a driver, the FMCSA forwards it to the issuing state and "state officials also decide how to respond when a driver challenges a citation's inclusion in the database." *Weaver*, 744 F.3d at 143. Once a State office makes a determination on the validity of a challenge FMCSA accepts the state reporting as the "final resolution of the challenge." *Id.* at 144. FMCSA "undertakes no investigating assessment, or evaluation of the accuracy of such [MCMIS] data." Answer to Consolidated Compl. ¶54, "admitted." JA 11. "FMCSA considers the state's determination of the validity of an RDR as the final

decision on the RDR.  FCMSA will not unilaterally change state records without state consent." JA 149.

Plaintiffs' PSP safety violations contained in MCMIS and available for dissemination through PSP, as alleged in the Consolidated Complaint and established in the administrative record, occurred from 2010-2013; all of Plaintiffs' inaccurate violation records are beyond the three year reportable date, and under FMCSA's current practice, are no longer subject to dissemination through PSP. However, the inaccurate records remain in MCMIS, and are available for uses of the MCMIS data. FMCSA's responsibility for inaccurate data is not limited to PSP reports.  The reach of the data and resulting injury to drivers is much broader and has a substantially longer life than the dissemination of the violation on PSP reports.  Reports of violations from roadside inspections by state enforcement officials to FMCSA that are incorporated into MCMIS and from there into numerous databases and record systems other than PSP, include: the Driver Information Resource, Driver Safety Measurement System , Carrier Safety Measurement System; Safety Fitness Electronic Records; and Enforcement Management Information System.  System of Records Notice ("SORN"), 74 Fed. Reg. 66391 (Dec. 15, 2009).  Because FMCSA intends to continue to maintain Plaintiffs' inspection data in its MCMIS database for these broad and varied uses,

45

Defendants are not relieved of their statutory duty to ensure the accuracy of that data.

Further, in 2014, after this case was initially filed, the FMCSA adopted an Interpretative Rule and Statement of Policy as to the MCMIS which allows inclusion of adjudicated citation results associated with violations documented during an inspection. 79 Fed. Reg. 32491 (Jun. 5, 2014). JA 390-395 . But nothing in the record suggests that FMCSA's policy of inaction with respect to a state's report of violation results has changed with the implementation of this Interpretive Statement of Policy. Nothing in the record suggests that FMCSA takes any action at all to fulfill its statutory obligation to ensure the accuracy of a state's report regarding adjudication results for driver citations. There is no policy in place that requires state law enforcement officials to post adjudication results in the MCMIS system. Plaintiffs here seek declaratory relief with respect to the violation of their rights to accuracy and Defendants' failure to protect their rights by their continuing failure to implement policies to ensure the accuracy of records maintained in MCMIS.

The Supreme Court has interpreted the Article III "cases and controversies" requirement to demand that "an actual controversy ... be extant at all stages of review, not merely at the time the complaint is filed." *Campbell-Ewald Co. v. Gomez*, 136 S.Ct. 663, 669 (2016) (citing *Arizonans for Official English v.*

46

*Arizona,* 520 U.S. 43, 67 (1997)). The Court noted that a claim may become moot where an intervening circumstance deprives the plaintiff of a "personal stake in the outcome of the lawsuit," at some point during litigation. *Id.* (citing *Genesis Healthcare Corp. v. Symczyk,* 133 S.Ct. 1523, 1528 (2013)). However, the Court found that a case becomes moot "'*only* when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" *Id.* (quoting *Knox v. Serv. Emps.,* 132 S. Ct. 2277, 2287 (2012) (emphasis added, internal quotation marks omitted). The Court further found that "'[a]s long as the parties have a concrete interest, *however small*, in the outcome of the litigation, the case is not moot.'" *Id.* (quoting *Chafin v. Chafin*, 133 S.Ct. 1017, 1023 (2013) (emphasis added, internal quotation marks omitted)).

This Circuit has consistently applied the standard for continued justiciability as recently reiterated by the Supreme Court. This Court held that "[i]n at least two kinds of cases the fact that the specific conduct that gave rise to the case has ceased does not mean that the challenge to the legality of that conduct is moot." *Del Monte Fresh Produce Co. v. U.S.*, 570 F.3d 316, 321 (D.C. Cir. 2009) (citing *City of Houston, Tex. v. Dep't of Housing & Urban Dev.*, 24 F.3d 1421, 1429-30 (D.C. Cir. 1994)); *see also Hardaway v. D.C. Housing Auth.*, 843 F.3d 973, 978 (D.C. Cir. 2016) (mootness inquiry asks whether events subsequent to the filing of the

complaint will render a decision by the court ineffectual as to plaintiff's rights).

The *Del Monte* Court held:

> First, *a plaintiff's challenge will not be moot where it seeks declaratory relief as to an ongoing policy*. . . Second, even though the specific action that the plaintiff challenges has ceased, a claim for declaratory relief will not be moot even if the "plaintiff has made no challenge to [an] ongoing underlying policy, but merely attacks an isolated agency action," so long as "the specific claim fits the exception for cases that are capable of repetition, yet evading review, or falls within the voluntary cessation doctrine."

*Del Monte,* 570 F. 3d at 321, (quoting *City of Houston, Tex.* 24 F.3d at 1429

(emphasis added)).

In *In re Navy Chaplaincy v. U.S. Navy*, plaintiffs alleged that Navy "policies, practices, and procedures" discriminated against them in awarding promotions. 697 F.3d 1171 (D.C. Cir. 2012). Plaintiffs did not challenge specific promotion decisions, but future injury based upon "concrete and consistently implemented policies." *Id.* at 1176-77. In the context of concrete, identified policy at issue, the D.C. Circuit held that the fact that "future selection boards may very well consider the promotion of at least some plaintiffs" was a sufficient imminent, non-speculative threat of injury to establish plaintiffs' Article III jurisdiction in the federal court. *Id.*; *see also Qassim v. Bush,* 466 F.3d 1073 (D.C. Cir. 2006) (distinguishes between cases challenging continuing government policy and those seeking relief only for a named individual; holding that challenge to policy allows controversy to remain live despite resolution of individual claim). Similarly, in

48

*Thorpe v. District of Columbia,* 916 F. Supp. 2d 65, 65-66 (D.D.C. 2013), the Court found that the plaintiffs' challenge to the policy of institutionalizing Medicaid recipients and request for declaratory relief was not moot just because those individuals had been moved to less restrictive facilities. Although the named claimants no longer were subject to the policy, a larger population was affected by the challenged policy. Accordingly, the claims were not moot and were allowed to continue. *Id.*; *see also Hardaway,* 843 F. 3d at 980 (defendant's assertion of mootness amounts to no more than a hollow promise not to deprive plaintiff of her rights in the future; holding that court had jurisdiction to hear claim).

This application of the mootness doctrine has a long history in American jurisprudence. Federal courts have long distinguished between cases which are moot because the plaintiff has lost his personal stake in the outcome of the case, and cases where the issue presented is no longer a live controversy. The Supreme Court has recognized that mootness has two aspects: "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 396 (1980) (citing *Powell v. McCormack,* 395 U.S. 486, 496 (1980)); *see also Murphy v. Hunt*, 455 U.S. 478, 481 (1982). Courts are more likely to dismiss "issue moot" cases, while demonstrating more flexibility with regard to "personal stake" mootness. *Geraghty*, 445 U.S. at 400-01; *Dunn v. Blumstein*, 405 U.S. 330, 333 n.2

49

(1972)(holding that challenge to Tennessee's durational residency requirements was not moot although challenger could now vote; the laws in question remained on the books, and plaintiff had standing to challenge them as a member of the class of people affected by the statute.)

The plaintiff in *Geraghty* sought to represent a class to challenge the Parole Commission's Release Guidelines. While his appeal was pending, the plaintiff was released from prison, which rendered his personal stake in the relief sought moot. 445 U.S. at 393-94.   Although his personal stake had expired, the issue that he sought to litigate remained live.  The Third Circuit declined to dismiss the plaintiff's appeal as moot, and the Supreme Court affirmed.  *Id.* at 404-407.  The Court explained "issue mootness" and "personal stake mootness" could be treated differently under Article III, with more flexibility where a case is rendered moot only by the plaintiff's loss of a personal stake in the outcome.  *Id.*

The *Geraghty* Court identified certain "practicalities and prudential considerations" to guide courts in deciding whether to dismiss as moot cases where the issue remained live but plaintiff's personal stake had become moot.   *Id.* at 404 n.11.  Rather than applying a "rigidly formalistic approach to Art. III," *Geraghty* held that courts should be guided by the purpose of the "personal stake" requirement, which is merely to ensure that the case is in a form capable of judicial review. "The imperatives of a dispute capable of judicial resolution" include (1)

50

"sharply presented issues in a concrete factual setting," and (2) "self-interested parties vigorously advocating opposing positions." *Id.* at 403-404 and n. 11. These two requirements may be satisfied even where the named plaintiff's substantive claim has become moot because (1) the named plaintiff's loss of a personal stake does not render the issues any less concrete or sharply presented, and (2) vigorous advocacy can be assured through means other than the traditional requirement of a "personal stake in the outcome." *Id.*

The issues raised by this action remain live. Plaintiffs, thousands of OOIDA members and all commercial truck drivers have a continuing, concrete interest in the policies and procedures that ensure that the safety records maintained by Defendants for potential dissemination accurately reflect the safety risk for individual drivers. At least some of the individual drivers, and most certainly some OOIDA members will be inspected, cited for a FMCSR violation, establish a dismissal or not guilty verdict, and will be refused correction of their record in MCMIS by a state administrator. ***FMCSA's policy to take no action regarding the accuracy of the state refusal to correct records in MCMIS remains its ongoing policy.*** FMCSA itself reports there were 3.5 million inspections conducted from January 1, 2013 through December 31, 2013. Motor Carrier Management Information System (MCMIS) Changes to Improve Uniformity in the Treatment of Inspection Violation Data, 79 Fed. Reg. 32491, 32493 (June 5, 2014) JA 390-393.

51

FMCSA concedes that there are "potentially thousands of past adjudicated citations which could quickly exhaust States' Data Qs capability." *Id.* at 32494. And significantly, FMCSA's admitted policy is to "undertake no investigation, assessment, or evaluation of the accuracy of the data" entered by the states into MCMIS. Answer to Consolidated Complaint ¶ 54; JA 11. Without question, the issue originally identified by the District Court—"whether the defendants are maintaining inaccurate information in the MCMIS"— JA 64—remains live.

The circumstances here satisfy the "practicalities and prudential considerations" identified by the Supreme Court as weighing in favor of continued justiciability. The issues are sharply presented in a concrete factual setting. In light of Defendants' admission that they undertake no investigation or other action with respect to the accuracy of data entered by the States into MCMIS, Defendants have not complied with their statutorily mandated duties to maintain data in their records systems with maximum "accuracy, relevance, timeliness and completeness." The parties are self-interested and vigorous advocates. This Court can hardly question the commitment that OOIDA, acting here in a representative capacity, has made to pursuing the issues raised by this action, even going so far as to file a second challenge relating to these issues in the Court of Appeals for this Circuit. This case was commenced more than five years ago, and OOIDA has devoted considerable time and resources to litigating these cases. The issues raised

by this action remain live in an adversarial context and in a form historically viewed as capable of judicial resolution.

Plaintiffs' claims are redressable by an Order from this Court or on remand to the District Court: (1) declaring Defendants' obligations and Plaintiffs' rights with respect to the assurance of the accuracy of information maintained in MCMIS as required by 49 U.S.C. §§ 31106(a)(3)(F), (a)(4)(A) & 31150(b)(1); the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*; and the Privacy Act, 5 U.S.C. § 552a; (2) enjoining Defendants from maintaining and disseminating any inaccurate information to third parties; and (3) compelling Defendants to purge from the MCMIS database any record of a safety violation for which there is no judicial determination of the driver's guilt.

## <u>CONCLUSION</u>

For all the foregoing reasons, this Court should reverse the District Court's dismissal of Plaintiffs' claims for lack of standing, and remand to the District court to address the merits of Plaintiffs' claims.

Respectfully submitted,

<u>/s/ *Paul D. Cullen, Sr.*</u>
PAUL D. CULLEN, SR.
JOYCE E. MAYERS
PAUL D. CULLEN, JR.
The Cullen Law Firm, PLLC
1101 30th Street NW, Suite 300
Washington, DC 20007
Tel: (202) 944-8600
Fax: (202) 944-8611

*Attorneys for Appellants*

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(C) and Cir. R. 32 (1) in that the brief contains **12,450** words excluding those parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

Dated:  April 7, 2017                    <u>/s/Paul D. Cullen, Sr.</u>
                                         Paul D. Cullen, Sr.
                                         *Counsel for Petitioner*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of April, 2017 an electronic copy of *Petitioner's Opening Brief*, was served via CM/ECF system to all parties of record.


Dated:   April 7, 2017

<u>*/s/ Paul D. Cullen, Sr.*</u>
PAUL D. CULLEN, SR.
JOYCE E. MAYERS
PAUL D. CULLEN, JR.
The Cullen Law Firm, PLLC
1101 30th Street NW, Suite 300
Washington, DC 20007
Tel: (202) 944-8600
Fax: (202) 944-8611

*Counsel for Petitioner*